1  HATTON, PETRIE & STACKLER APC
Attorneys at Law
2  20281 Birch Street, Suite 100
Newport Beach, CA 92660
3  Telephone:  (949) 474-4222

4

5  **GREGORY M. HATTON, CAL. BAR NO. 119810**
**ARTHUR R. PETRIE, II, CAL. BAR NO. 158654**

6
Attorneys for Defendant
7  NATIONAL PYGMY GOAT ASSOCIATION

8              UNITED STATES DISTRICT COURT

9            SOUTHERN DISTRICT OF CALIFORNIA

10

11  ——————————————————————
                                          )
12  DEBRA HOSLEY, et al., etc.             )        No. 14-CV-0290-H-BLM
                                          )
13                      Plaintiffs,        )        NOTICE OF MOTION AND
                                          )        MOTION TO DISMISS FOR
14                                         )        FAILURE TO STATE A CLAIM
        vs.                               )        UPON WHICH RELIEF CAN BE
15                                         )        GRANTED
                                          )        (FRCP 12(b)(6))
16  NATIONAL  PYGMY GOAT                   )
    ASSOCIATION,                          )
17                                         )
                                          )
18                      Defendant.         )
                                          )
19  ——————————————————————

20            **NOTICE OF MOTION AND MOTION**

21          TO THE COURT, AND TO ALL PARTIES AND THEIR ATTORNEYS OF

22  RECORD:

23          PLEASE TAKE NOTICE THAT on May 5, 2014, at 10:30 am, or as soon

24  thereafter as the matter may be heard in the above-entitled Court, located at 333

25  West Broadway, San Diego, California, Courtroom 15A, defendant National Pygmy

26  Goat Association ("NPGA"), will and hereby does move the Court to dismiss this

27  action or certain portions of this action pursuant to FRCP 12(b)(6).  The Court

28

1    should grant the relief sought because plaintiff's complaint fails to state a claim

2    upon which relief can be granted on the grounds that:

3         1.    The first cause of action ("count") for violation of section one of the

4               Sherman Antitrust Act fails to state facts sufficient to constitute a

5               cause of action against NPGA;

6         2.    The second cause of action for violation of section two of the Sherman

7               Antitrust Act fails to state facts sufficient to constitute a cause of

8               action against NPGA;

9         3.    The third cause of action for violation of the Cartwright Act fails to

10              state facts sufficient to constitute a cause of action against NPGA;

11        4.    The fourth cause of action for violation of the Lanham Act fails to

12              state facts sufficient to constitute a cause of action against NPGA;

13        5.    The fifth cause of action for Interference with Business Relations fails

14              to state facts sufficient to constitute a cause of action against NPGA;

15        6.    Complainants allegations of conspiracy are vague and ambiguous.

16            The motion will be based on this Notice of Motion and Motion, the

17    Memorandum of Points and Authorities set forth below, and on the pleadings and

18    papers filed herein.

19            Respectfully submitted,
      Dated:  April 1, 2014
20
                                        HATTON, PETRIE & STACKLER
21

22

23            By:              /S/ Arthur R. Petrie, II

24            _____
                        Arthur R. Petrie, II
                    Attorneys for Defendant
25                  NATIONAL PYGMY GOAT ASS'N

26

27

28

- 2 -

1

TABLE OF CONTENTS

2

I.   INTRODUCTION ..................................................................... 1

3

II.  STATEMENT OF FACTS ......................................................... 2

4

III. DISCUSSION ........................................................................... 5

5

   A. THERE IS NO UNREASONABLE RESTRAINT OF TRADE
6
      UNDER SECTION 1 OF THE SHERMAN ACT ................................. 5

7
     1.  NO CONTRACT, COMBINATION OR CONSPIRACY IN
        RESTRAINT OF TRADE .................................................. 5
8
     2.  THE BOARD REASONABLY ADOPTED A RULE
9
        CONSISTENT WITH THE ASSOCIATION'S PURPOSES .......... 6

10
       A.  THE *HATLEY* COURT APPLIED THE RULE OF
          REASON IN ANALYZING A SIMILAR BREED
11
          STANDARD ................................................................. 9

12
       B.  THE BREED STANDARD WAS REASONABLY
          AMENDED ................................................................. 10
13
       C.  PLAINTIFFS HAVEN'T ALLEGED FACTS
14
          OVERCOMING THE PRESUMPTION THE BOARD'S
          ACTS WERE REASONABLE ........................................... 10
15
     3.  NPGA DID NOT CONSPIRE WITH ANYONE ........................... 12
16
   B. NPGA EXERCISES NO UNLAWFUL MONOPOLY ...................... 13
17
   C. PLAINTIFFS LACK STANDING TO BRING ANTITRUST
18
      CLAIMS ........................................................................... 15

19
   D. THERE IS NO ALLEGATION NPGA MADE ANY FALSE OR
      MISLEADING STATEMENTS ABOUT ANYTHING ..................... 15
20
   E. PLAINTIFFS' STATE LAW CLAIMS COLLAPSE FOR THE
21
      REASONS STATED ABOVE ................................................... 16

22
     1.  NO CARTWRIGHT ACT VIOLATION ...................................... 16
23
     2.  NPGA DID NOT TORTIOUSLY INTERFERE WITH
        PLAINTIFFS PROSPECTIVE ECONOMIC ADVANTAGE ....... 17
24
IV.  CONCLUSION ...................................................................... 20
25

26

27

28

1

## TABLE OF AUTHORITIES

2

### Cases

3

*Ashcroft v. Iqbal* (2009) 556 US 662 ...................................................... 11, 20

*Aydin Corp. v Loral Corp.* (9th Cir 1983) 718 F.2d 897 .............................7

*Barrus v. Sylvania* (9th Cir. 1995) 55 F.3d 468 ..............................................15

*Bell Atlantic Corp. v. Twombly* (2007) 550 US 544 ......................................11

*Caitlin v. Washington Energy Co.* (9th Cir. 1986) 791 F.2d 1343...................14

*Calculators Hawaii, Inc. v. Brandt, Inc.* (9th Cir. 1983) 724 F.2d 1332 ................................................................................................6

*California Dental Ass'n v. FTC* (9th Cir. 2000) 224 F.3d 942 .......................10

*Cascade Cabinet Co. v Western Cabinet & Millwork, Inc.* (9th Cir 1983) 710 F.2d 1366 .....................................................................7

*Chapman v. Rudd Paint & Varnish Co.* (9th Cir. 1969) 409 F.2d 635 ................................................................................................6

*Chicago Title Ins. Co. v. Great W. Fin. Corp.* (1968) 69 Cal.2d 305 ...............................................................................................16

*Copperweld Corp. v. Independence Tube Corp.* (1984) 467 US 752 ...............................................................................................13

*Cowley v. Braden Indus.* (9th Cir. 1980) 613 F.2d 751....................................13

*De Voto v Pacific Fid. Life Ins. Co.* (9th Cir. 1980) 618 F.2d 1340 ..............................................................................................7

*Eagle v. Star-Kist Foods, Inc.* (9th Cir. 1987) 812 F.2d 538 ..........................15

*Eldridge v. Tymshare, Inc.* (1986) 186 Cal.App.3d 767 .......................... 11, 12

*Exxon Corp. v. Superior Court* (1997) 51 Cal.App.4th 1672..........................17

*Fairchild v. Bank of America* (1961) 192 Cal.App.2d 252 .............................11

*Fornaseri v. Cosmosart Realty & Bldg. Corp.* (1929) 96 Cal.App. 549 ...............................................................................................12

*Hatley v. American Quarter Horse Association* (5th Cir. 1977) 552 F.2d 646............................................................................ passim

*Havaco of Am. Ltd. v Shell Oil Co.* (7th Cir 1980) 626 F.2d 549 ...............................................................................................7

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Jessup v. The American Kennel Club, Inc.* (S.D.N.Y. 1999) 61
F.Supp.2d 5 ...................................................................................5

*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th
1134 .............................................................................................18

*Leegin Creative Leather Prods., Inc. v PSKS, Inc.* (2007) 551
US 877 ...........................................................................................6

*Marili v. Pacific Gas & Elec. Co.* (1975) 51 Cal.App.3d 313 ........................11

*Monsanto Co. v. Spray-Rite Serv. Corp.* (1984) 465 US 752 ..........................6

*OSC Corp. v. Apple Computer, Inc.* (9th Cir. 1986) 792 F.2d
1464 ...............................................................................................6

*Roth v. Rhodes* (1994) 25 Cal.App.4th 530 .............................................. 18, 19

*Silver v. New York Stock Exchange* (1963) 373 US 341 ............................. 9, 10

*Sole Energy Co. v. Petrominerals Corp.* (2005) 128 Cal.App.4th
212 ............................................................................................ 18, 19

*Starbird v. Lane* (1962) 203 Cal.App.2d 247 ...................................................11

*Syufy Enters. v. American Multicinema, Inc.* (9th Cir. 1986) 793
F.2d 990 ........................................................................................13

*U.S. Steel Corp. v. Fortner Enterprises* (1977) 429 U.S. 610 .........................14

*United States v. Griffith* (1948) 334 U.S. 100 .................................................14

*United States v. Swift & Co* (1932) 286 U.S. 106 ...........................................14

*Will v. Engebretson & Co.* (1989) 213 Cal.App.3d 1033 ...............................11

*Youst v. Longo* (1987) 43 Cal.3d 64 ...............................................................17

<u>Treatises</u>

Brown, Cal. Business Litigation (Cont.Ed.Bar 2013) ............................ passim

1     **MEMORANDUM OF POINTS AND AUTHORITIES**

2

3 **I.**  **INTRODUCTION**

4    Defendant National Pygmy Goat Association ("NPGA") is a non-profit

5 entity dedicated to promotion of the pygmy goat breed.  Like quarter horses,

6 acceptable pygmy goat specimens are primarily defined by coloration, not

7 ancestry.  As a part of its mission the NPGA therefore establishes "breed

8 guidelines" regarding acceptable coloration patterns.  These breed guidelines

9 are subject to change by the NPGA board of directors, in accordance with

10 NPGA governing documents.

11    One such amendment made goats designated "Grey/Brown Agoutis"

12 ineligible for NPGA registration.  Plaintiffs are disappointed breeders who

13 have, in the past, produced Grey/Brown Agouti goats.  In a rambling,

14 disjointed, passively-voiced and vague 23-page complaint plaintiffs sue to

15 force the NPGA to further revise the breed standard and thereby endorse their

16 Grey/Brown Agouti goats.

17    Plaintiffs are unable to state a claim against the NPGA because:

18   (1) The NPGA has not engaged in an unreasonable restraint of trade:

19    (A) The change in the breed standard is not unreasonable per se;

20    (B) Plaintiffs have not alleged sufficient facts to state a plausible

21     claim for relief:

22     (i) Plaintiffs have not alleged facts overcoming the Business

23      Judgment Rule's presumption of reasonableness;

24     (ii) In fact, regardless of the Business Judgment Rule, plaintiffs

25      have not alleged facts showing the amended breed standard

26      is an unreasonable restraint of trade;

27   (2) Plaintiffs have not adequately alleged NPGA conspired with anyone;

28   (3) NPGA does not exercise unlawful monopoly power;

1        (4) Consequently plaintiffs have not established their state-court

2              antitrust claims;

3        (5) Plaintiffs have not alleged NPGA made any false or misleading

4              statements about their goats;

5        (6) Plaintiffs have not alleged facts amounting to a state court claim for

6              interference with prospective business advantage.

7 Accordingly, plaintiffs' complaint must be dismissed.

8

9 **II.**     **STATEMENT OF FACTS**

10       The following facts are drawn from plaintiffs' complaint.  This recital is

11 no admission of their accuracy.

12       All plaintiffs are in the business of raising and selling "grey/brown

13 agouti" goats.  (Comp. ¶¶ 1-6, 23, 25)  They are members of the NPGA and an

14 affiliate club.  (Comp. ¶¶ 7, 23)  Before the breed standard amendment

15 mentioned below, Grey/Brown Agoutis had received high rankings in NPGA

16 shows.  (Comp. ¶ 49)

17       The NPGA is a non-profit organization.  (Comp. ¶ 8)  It was formed and

18 exists for the purpose of supporting the pygmy goat in the United States by

19 collecting and disseminating information and protecting the breed standard.

20 (Comp. ¶ 28)  NPGA objectives include:

21         ➢ Facilitating communication and cooperation among breeders;

22         ➢ Encouraging the breeding and registering of characteristic pygmy

23           goats;

24         ➢ Establishing regional affiliate clubs;

25         ➢ Gathering and disseminating practical and theoretical knowledge

26           of the pygmy goat;

27         ➢ Promoting and popularizing the breed by exposure and through

28           publications; and

1        ➢ Facilitating and registering certified pygmy goat seed stock and
2            their offspring.

3   (Comp. ¶ 28)  Some NPGA members compete with plaintiffs' breeding

4   businesses; the NPGA is controlled by its membership.  (Comp. ¶ 29)  NPGA

5   breed standards and rules may be modified by its board of directors, the

6   members of which are also NPGA members.  (Comp. ¶¶ 29, 82)

7        The gist of plaintiffs' complaint is that "breeders without any

8   Grey/Brown Agoutis" engaged in a conspiracy to harm them, by making

9   numerous false, misleading and untrue oral and written statements about

10  Grey/Brown Agoutis.  (Comp. ¶ 26)  These breeders do not own any

11  Grey/Brown Agoutis, and are referred to throughout the complaint as

12  "proponents," defined as "breeder members of the NPGA [who] do not breed"

13  Grey/Brown Agoutis.  (Comp. ¶ 41, 42, 74)

14       Beginning in June 2008 the NPGA board received[1] "complaints" that

15  Grey/Brown Agouti was an "undesirable" color, caused by cross-breeding.

16  (Comp. ¶ 37)  These complaints led to a June 2008 report to the Board

17  recommending amendments to the breed standard.  The Board did not adopt

18  this recommendation.  (Comp. ¶ 38)

19       The "proponents" remained disappointed following the Board's June

20  2008 rejection of any relevant alteration to the breed standard.  At the January

21  2009 board meeting, they renewed efforts to amend the breed standard,

22  presenting the Board with further materials.  (Comp. ¶¶ 47, 48, 49)  These

23  efforts and materials included false allegations that Grey/Brown Agouti goats

24  were the result of impermissible cross-breeding.  (Comp. ¶ 44)  In turn,

25  plaintiffs continually presented the Board with their contrary point of view,

26  supported by documentary and other evidence.  (Comp. ¶¶ 45, 46, 50)  A

27  ────────────────
    [1] Plaintiff's consistent use of the passive voice makes it impossible to know
28  who the actors are.

1   January 2009 motion to amend the relevant breed standard also failed.  (Comp.

2   ¶ 51)

3        The "proponents" kept up their efforts.  They created a social media

4   site, which stated their views were based on a desire to preserve the purity of

5   the breed.  (Comp. ¶ 55)  There is no allegation that the NPGA had anything to

6   do with this site.

7        Another motion to amend the breed standard was made at the June 2009

8   meeting.  It also failed.  (Comp. ¶ 57)

9        Finally "in 2010" a motion passed removing the "all colors" language in

10  the breed standard.[2]  Beginning in March 2012, plaintiffs' Grey/Brown Agouti

11  goats were denied registration as non-conforming because of their coloration.

12  (Comp. ¶ 67, 68, 74)

13       In June 2013 the Board adopted a further rule disqualifying non-

14  conforming goats from competition.  (Comp. ¶ 70)

15       The NGPA's refusal to register Grey/Brown Agoutis, or to allow them

16  to compete in sanctioned shows, reduces competition among breeders of goats.

17  (Comp. ¶ 72)  The "proponents" of the change in breed standard had an

18  "economic incentive" to exclude Grey/Brown Agoutis.  (Comp. ¶ 75)

19       Finally, plaintiffs conclude that the new breed standard is unreasonable.

20  (Comp. ¶ 77)

21  // // //

22  // // //

23  // // //

24  // // //

25  // // //

26  _____

27  [2] The Board meets twice a year, in January and June.  This motion was
    approved at the January 2010 meeting.  Plaintiffs' claims will therefore be

28  subject to a statute of limitations defense.  (15 USC § 15(b).)

1    **III.    DISCUSSION**

2       The gravamen of plaintiffs' case is that, over the course of several years,

3    the "proponents" (NPGA members who do not breed "grey/brown agouti"

4    goats) managed to persuade the NPGA Board of Directors to amend the breed

5    standard, effectively excluding "grey/brown agouti" goats from registration or

6    show competition, thereby harming plaintiffs, who hitherto had bred

7    "grey/brown agouti" goats.

8       Plaintiffs' problem is that the NPGA exists to set breed standards.  In so

9    doing, it will necessarily provide competitive advantages to goats who meet

10   the standards and corresponding disadvantages to those that do not.  (See, e.g.,

11   *Jessup v. The American Kennel Club, Inc.* (S.D.N.Y. 1999) 61 F.Supp.2d 5,

12   12.)  This is reasonable, lawful activity.  (*Hatley v. American Quarter Horse*

13   *Association* (5th Cir. 1977) 552 F.2d 646, 652-653.)

14      Further, there is no evidence the NPGA conspired with a competitor to

15   achieve an unlawful act, or to achieve a lawful act by unlawful means.

16      Next, plaintiffs do not allege any untrue or misleading statements by the

17   NPGA about their goats.

18      Finally, plaintiffs have not made out the elements of a claim for

19   interference with prospective business advantage under California law.

20

21      A.    THERE IS NO UNREASONABLE RESTRAINT OF TRADE

22            UNDER SECTION 1 OF THE SHERMAN ACT

23         1.    No Contract, Combination or Conspiracy in Restraint of Trade

24      Nowhere does plaintiff allege the NPGA engaged in a contract or

25   conspiracy with anyone.  Read most favorably to plaintiffs, the complaint

26   alleges "proponents" of amending the breed standard were their competitors,

27   and these "proponents" conspired among themselves to engage in unlawful

28   acts in restraint of trade.

1    By contrast, plaintiffs allege that, over the course of several years the

2    NPGA's Board was presented with voluminous materials, by both sides in the

3    amendment debate, before reaching a decision to amend the breed standard.

4    As a matter of law, the NPGA and its Board cannot form a combination, or

5    conspiracy.  (*Calculators Hawaii, Inc. v. Brandt, Inc.* (9th Cir. 1983) 724 F.2d

6    1332, 1336; *Monsanto Co. v. Spray-Rite Serv. Corp.* (1984) 465 US 752;

7    *Chapman v. Rudd Paint & Varnish Co.* (9th Cir. 1969) 409 F.2d 635, 653 n.

8    9.)  Contrary to any unlawful conspiracy, the allegations of the complaint

9    show a deliberative, reasonable exercise of the Board's independent business

10   judgment.  (*OSC Corp. v. Apple Computer, Inc.* (9th Cir. 1986) 792 F.2d

11   1464, 1469.)

12

13       2.    The Board Reasonably Adopted a Rule Consistent with the

14              Association's Purposes

15   Plaintiffs claim the amended breed standard is a "naked" restraint of

16   trade in violation of Section 1 of the Sherman Act.  Defendant supposes that

17   plaintiffs mean the standard is an unreasonable restraint, "per se," in violation

18   of the Act.

19       There are limited practices that have been determined to be "per se"

20   unreasonable restraints of trade under the Sherman Act, specifically:

21       (1) Price fixing;

22       (2) Horizontal division of customers or geographical markets;

23       (3) Concerted refusals to deal (group boycotts); and,

24       (4) Tying agreements.

25   Courts are extremely reluctant to expand the per se violations beyond these

26   traditional categories.  (1 Brown, Cal. Business Litigation (Cont.Ed.Bar 2013)

27   Antitrust, § 5.57, pp. 330-331, citing *Leegin Creative Leather Prods., Inc. v*

28   *PSKS, Inc.* (2007) 551 US 877, (vertical price restraints judged by rule of

- 6 -

1   reason, not  per se  violations); *Aydin Corp. v Loral Corp.* (9th Cir 1983)

2   718 F.2d 897, 900 (refusing to treat executive's covenant not to compete

3   with former employer as per se violation of §1); *Cascade Cabinet Co. v*

4   *Western Cabinet & Millwork, Inc.* (9th Cir 1983) 710 F.2d 1366;  *Havaco of*

5   *Am. Ltd. v Shell Oil Co.* (7th Cir 1980) 626 F.2d 549, 555; *De Voto v*

6   *Pacific Fid. Life  Ins. Co.* (9th Cir. 1980) 618 F.2d 1340,  1344.)

7           Not falling into one of these narrow "per se" categories, the amended

8   breed standard must be evaluated under the "rule of reason."

9           *Hatley, supra,* 552 F.2d 646 presents similar facts (albeit with respect to

10   quarter horses, not goats).  The following summary of the facts in *Hatley* is

11   drawn from pages 649-650 of the decision.

12           The quarter horse is generally a solid color except for occasional white

13   on the lower legs and part of the face.  These factors distinguish it from pinto,

14   appaloosa and albino horses.  The pinto (paint) and appaloosa are different

15   types with distinctive irregular white markings.  The American Paint Horse

16   Association does not register appaloosas, and the appaloosa association does

17   not register paints.

18           Quarter horse "Mr. Jet Moore" was a champion. He won over $340,000

19   in racing purses and in 1972 was named World Champion Running Horse by

20   the AQHA.  A mare, "Chickamona" won $110,000 in racing purses.  In an

21   industry where pedigree is carefully scrutinized, it is significant that both

22   horses had ancestors whose records were outstanding.  Plaintiff Hatley's colt

23   "Naturally High" was the product of these two champions.

24           The AQHA is a non-profit Texas corporation.  It was formed for the

25   purpose of collecting, recording, and preserving the pedigrees of Quarter

26   Horses, to publish a Stud Book and registry, and to stimulate and regulate any

27   and all other matters such as may pertain to the history, breeding, exhibition,

28   publicity, sale, racing or improvements of the breed.

1    AQHA registration is usually a simple process.  The record owner of the

2   foal's dam submits an application, a breeder's certificate and a registration fee.

3   ***Because coloring and markings aid in distinguishing the quarter horse from***

4   ***less popular breeds, the application provides for a pictorial description of the***

5   ***horse***.  However, it is sometimes difficult to say precisely where the quarter

6   horse ends and the paint horse begins.  The AQHA therefore has a "white

7   rule."  This rule codifies the distinction between the quarter horse and other

8   members of the equine family. The white rule (hereinafter styled Rule 92) read

9   as follows:

10          92. A. No animal having white markings with underlying light
            skin beyond the following described lines shall be eligible for
11          registration in any section of the Association's official Stud
            Book. The prescribed lines for white markings with underlying
12          light skin are as follows:

13          1. White above a line around each leg at the center of the knees
            and point of the hocks.
14
            2. White behind a line running from the center of each ear to the
15          corner of each side of the mouth; and

16          3. White on the lower lip above a line running from one corner of
            the mouth to the other corner.
17

18    Rule 92 is aimed not at the total amount of white markings on the body

19   of the animal, but at the amount of white markings beyond specified areas on

20   the body. Thus, a horse with a few white spots on its flank and a solid chestnut

21   color elsewhere might be denied quarter horse registration while a horse with

22   solid white markings below the knees and hocks would be registered, even

23   though the latter had more square inches of white overall.  The purpose of the

24   rule is, among other things, to avoid introduction of genes tainting the breed.

25   (*Id.* at 651.)

26    Plaintiff Hatley's colt Naturally High was denied AQHA registration,

27   despite being bred from registered champions, because Naturally High had too

28   much white pigment, in the wrong areas.  Hatley sued the AQHA, along with

1  members of its Executive Committee, and the employee in charge of

2  registration for anti-trust violations due to the refusal to register Naturally

3  High.  Registered, Naturally High would be worth as much as $100,000 (in

4  1977 dollars), unregistered he would be worth less than $10,000.  (*Id.* at 655.)

5       The trial court ruled for the defendants on the anti-trust charges.  The

6  Court of Appeals affirmed.

7

8       a.    The *Hatley* court applied the Rule of Reason in analyzing a

9            similar breed standard

10      Plaintiff Hatley argued the AQHA's refusal to register Naturally High

11  was a "group boycott and therefore an unreasonable restraint *per se*."  (*Hatley,*

12  *supra,* 552 F.2d at 652, original emphasis.)  The court disagreed:

13
        In an industry which necessarily requires some interdependence
14      and cooperation, the *per se* rule should not be applied
        indiscriminantly.  In some sporting enterprises a few rules are
15      essential to survive.  ***The definition of a quarter horse is an***
        ***inquiry which the AQHA, as a sanctioning organization, ought***
16      ***to be able to pursue***.  If the inquiry is anti-competitive, the rule of
        reason can be utilized to attack it.
17

18  (*Id.* at 652-653, bold-faced italics added; citing *Silver v. New York Stock*

19  *Exchange* (1963) 373 US 341, 348-349 ("*Silver*").)

20      Similarly, as a sanctioning organization, the NPGA should be able to

21  pursue inquiry into the proper definition of a pygmy goat.  If its decision-

22  making based on such inquiry is anti-competitive, the rule of reason can be

23  used to attack it.

24  // // //

25  // // //

26  // // //

27  // // //

28

1          b.     <u>The breed standard was reasonably amended</u>

2     Under the "rule of reason" action is anticompetitive only if:

3     (A)  the parties to the conspiracy intend to harm or restrain competition;

4     (B) an actual injury to competition occurs, and

5     (C) the restraint is unreasonable as determined by balancing the restraint

6          and any justifications or procompetitive effects of the restraint.

7 (*California Dental Ass'n v. FTC* (9th Cir. 2000) 224 F.3d 942, 947.)

8     Under a similar analysis, the *Hatley* court found Rule 92 was "a

9 legitimate tool in the effort to improve the breed." (*Hatley, supra,* 552 F.2d at

10 653.)  In reliance on *Silver*, plaintiff Hatley argued the AQHA abused its

11 discretion because it held no hearing on his application.  The court disagreed,

12 finding ample fact-finding and deliberation supported the decision:

13
> [T]he Association's information was derived primarily from the
14 > plaintiff.  Before its final decision it requested additional
> photographs and Hatley was alerted to the fact "things weren't
15 > going too smooth" because of the white on the colt's upper legs.

16 (552 F.2d at 653-654.)

17     Here, plaintiff admits a 3-year deliberative process undertaken by the

18 NPGA Board, during which time proponents and opponents presented

19 voluminous materials for and against amending the breed standard.

20 Ultimately, the Board agreed with the proponents.  As in *Hatley* this was no

21 discriminatory, arbitrary or capricious act.  It was reasonable and squarely

22 within the declared ambit of the NPGA's mission.

23

24          c.     <u>Plaintiffs haven't alleged facts overcoming the</u>

25          <u>presumption the Board's acts were reasonable</u>

26     Further, under the Business Judgment Rule this court must indulge

27 every presumption in favor of the reasonableness of the amendment.

28

- 10 -

1    The burden is on plaintiffs to allege facts which, if credited as true,

2    would overcome the presumption of reasonableness of board action under the

3    business judgment rule.  The Association's Board's decision is presumptively

4    valid.  Every presumption is in favor of the good faith of the board of

5    directors.  (*Starbird v. Lane* (1962) 203 Cal.App.2d 247, 255.)  Interference

6    with the Board's decision is not warranted in doubtful cases.  (*Fairchild v.*

7    *Bank of America* (1961) 192 Cal.App.2d 252, 257.)

8    The business judgment rule is predicated on the notion that the directors

9    are better able than courts to judge whether a particular act or transaction is

10   helpful to the conduct of corporate affairs or expedient for the attainment of

11   corporate purposes.  (*Will v. Engebretson & Co.* (1989) 213 Cal.App.3d 1033,

12   1040.)  The rule reflects a judicial policy of deference to the judgment of

13   corporate directors in the exercise of their broad discretion in making

14   corporate decisions, which prevents courts or minority shareholders (or

15   Association members) from substituting their judgment for that of directors

16   who have acted in good faith and used their best business judgment on behalf

17   of the corporation.  (*Marili v. Pacific Gas & Elec. Co.* (1975) 51 Cal.App.3d

18   313, 324.

19   Consequently, courts impose stricter pleading requirements in cases

20   attacking board action that is admittedly within the scope of its authority.

21   General charges of fraud, conspiracy, and bad faith on the part of the corporate

22   directors are insufficient in the absence of allegations of specific facts

23   adequate to show the basis for the general charges.  (*Eldridge v. Tymshare,*

24   *Inc.* (1986) 186 Cal.App.3d 767, 776; *cf Bell Atlantic Corp. v. Twombly*

25   (2007) 550 US 544, 556, *Ashcroft v. Iqbal* (2009) 556 US 662, 678-679.)

26   // // //

27   // // //

28   // // //

1    The complaint must plead specific acts or conduct on the part of the

2    directors that could be said to constitute fraudulent or dishonest acts or gross

3    abuse of their authority or discretion with respect to the corporation.

4    (*Eldridge, supra,* 186 Cal.App.3d at 776.)

5    To warrant interference by a court in favor of minority shareholders (or,

6    by analogy, Association members), "a case must be made out which plainly

7    shows that an action is so far opposed to the true interests of the corporation

8    itself as to lead to the clear inference that no one so acting could have been

9    influenced by any honest desire to secure such interest, but that he or she must

10   have acted with an intent to serve some outside purpose, regardless of the

11   consequences" to the corporation.  (*Fornaseri v. Cosmosart Realty & Bldg.*

12   *Corp.* (1929) 96 Cal.App. 549, 557, citations omitted.)

13   Plaintiffs admit the challenged decision was made by the Association's

14   Board of Directors, pursuant to its authority to amend the breed standard.

15   Their claims are nothing more than "sour grapes":  after going toe-to-toe with

16   "proponents" of the amendment plaintiffs did not get the decision they wanted.

17   Simply stated, plaintiffs do not like the result and, instead of engaging in a

18   democratic effort within the NPGA to change the result, brought this lawsuit.

19

20   3.    NPGA Did Not Conspire With Anyone

21   The NPGA is the only named defendant.  Plaintiffs allege efforts by

22   unnamed "proponents" to persuade the Board to amend the breed standard.

23   But there is no allegation the Board "conspired" with the proponents.  And, as

24   a matter of law members of the Board, or the NPGA Business Director, cannot

25   conspire with the NPGA.  As in *Hatley,*

26       There was no conspiracy.  Plaintiff's alleged conspirators were

27       the AGHA, members of the Executive Committee and [a] staff

28       employee….  There can be no conspiracy or agreement between a

- 12 -

corporation and its officers and agents to violate the antitrust laws.

(*Hatley, supra,* 552 F.2d at 654; *Copperweld Corp. v. Independence Tube Corp.* (1984) 467 US 752, 759.)

B.    NPGA EXERCISES NO UNLAWFUL MONOPOLY

Plaintiffs allege the NPGA was formed over 35 years ago.  Since that time it has registered more than 113,700 pygmy goats.  (Comp. ¶ 28)  Formulation of the breed standard was a priority upon formation of the registry.  (Comp. ¶ 31)  Between 1975 and 2005 there were at least 20 changes to the breed standard.  (Comp. ¶¶ 33-34)

As demonstrated above, plaintiff has not alleged facts constituting anti-competitive acts under Section 1.  Accordingly, to establish a monopolization claim plaintiff must plead facts showing:

(1) Possession of monopoly power in the relevant market;

(2) Willful acquisition or maintenance of that power; and,

(3) Causal "antitrust" injury.

(*Syufy Enters. v. American Multicinema, Inc.* (9th Cir. 1986) 793 F.2d 990, 993.)  Mere possession of monopoly power is insufficient to constitute a violation of the Sherman Act Section 2:  the defendant must have acquired or maintained the monopoly through the kind of predatory conduct described in elements (2) and (3) above.  (*Cowley v. Braden Indus.* (9th Cir. 1980) 613 F.2d 751, 756.)

There is no allegation of such predatory conduct.  To the contrary, as noted above, plaintiff alleges NPGA's foundation and growth to be the product of superior work by "a very learned and dedicated group of individuals with specialized knowledge and expertise in the areas of biology, zoology, physiology, medicine, genetics and breeding and judging livestock."

- 13 -

1   (Comp. ¶ 31.)  Thus if it is a monopoly, NPGA got there through hard work

2   and innovation, not anticompetitive practices.  (*See, e.g., Caitlin v.*

3   *Washington Energy Co.* (9th Cir. 1986) 791 F.2d 1343, 1345.)

4           Again, in discussing plaintiff's Section 2 claim, the *Hatley* court

5   acknowledged that participation in the quarter horse industry "is dependent

6   upon AQHA membership and AQHA registration."  (552 F.2d at 654)

7
        But bigness is not necessarily badness.  *United States v. Swift &*
8       *Co., 286 U.S. 106, 116, 52 S. Ct. 460, 76 L. Ed. 999 (1932)*; *cf.*
        *U.S. Steel Corp. v. Fortner Enterprises, 429 U.S. 610,    n. 1, 97*
9       *S. Ct. 861, 51 L. Ed. 2d 80* [1977]. The layman's monopoly is not
10      necessarily an illegal monopoly under *Section 2:*

11
            "Anyone who owns and operates the single theatre in a town,
12          or who acquires the exclusive right to exhibit a film, has a
            monopoly in the popular sense. But he usually does not violate
13          *§ 2* of the Sherman Act unless he has acquired or maintained
            his strategic position, or sought to expand his monopoly, or
14          expanded it by means of those restraints of trade which are
            cognizable under *§ 1.*"
15

16

17      *United States v. Griffith, 334 U.S. 100, 106, 68 S. Ct. 941, 945, 92*
        *L. Ed. 1236 (1948).*  When the nature of the industry requires
18      some limitations upon entrance, *Section 2* is not violated. *Cf.*
        *Deesen v. Professional Golfers, Ass'n, supra.*  Even though a
19      single organization exercises the dominant role in a market, its
        rules may be found to promote competition rather than hinder it.
20      *Bridge Corp. of America v. American Contract Bridge League,*
        *Inc., supra; Deesen, supra.*
21

22  (*Hatley, supra,*  552 F.2d at 654.)  The NPGA exists to promote the pygmy

23  goat breed.  That is its mission.  In so doing it must establish a dividing line

24  between pygmies and other goats.  This is pro-competitive:  it fosters

25  competition improving the breed.

26  // // //

27  // // //

28

                                    - 14 -

1    Further, as noted above, nowhere in plaintiffs' complaint is there an

2    allegation the NPGA intended to use the amended breed standard for

3    anticompetitive purposes.  In light of the absence of such allegations, under

4    the Business Judgment Rule, the NPGA Board is presumed to have acted in

5    good faith.  "In the absence of either anticompetitive purpose or effect…the

6    *Section 2* claim collapses."  (*Id.*)

7

8    C.    PLAINTIFFS LACK STANDING TO BRING ANTITRUST

9          CLAIMS

10    Plaintiffs allege they are breeders and sellers of goats.  The NPGA

11    however, is a nonprofit formed for the purpose of supporting the pygmy goat

12    in the United States by collecting and disseminating information and

13    protecting the breed standard.  (Complaint ¶ 28)  In other words, plaintiffs and

14    NPGA are not "competitors."  Nor are plaintiffs a "consumer" of NPGA

15    goods or services.  In order to establish standing, a party alleging antitrust

16    injury "must be either a consumer of the alleged violator's goods or services

17    or a competitor of the alleged violator in the restrained market."  (*Eagle v.*

18    *Star-Kist Foods, Inc.* (9th Cir. 1987) 812 F.2d 538, 540.)  Being neither,

19    plaintiffs lack standing to make these antitrust claims.

20

21    D.    THERE IS NO ALLEGATION NPGA MADE ANY FALSE OR

22          MISLEADING STATEMENTS ABOUT ANYTHING

23    To make out a Lanham Act claim for false advertising, "the plaintiff

24    must allege commercial injury based upon a misrepresentation about a

25    product, and also that the injury was 'competitive,' i.e., harmful to the

26    plaintiff's ability to compete **with the defendant**."  (*Barrus v. Sylvania* (9th

27    Cir. 1995) 55 F.3d 468, 470, emphasis added.)

28    First, defendant NPGA does not compete with plaintiffs.

- 15 -

1    Next, according to the complaint, any false or misleading statements

2  were made *to* the NPGA by the proponents of amending the breed standard.

3  There are no false or misleading statements ***attributed to*** the NPGA.

4    Finally, all NPGA action was based on an honest evaluation of the

5  plaintiffs' goats under the amended breed standard:  plaintiffs admit their

6  goats are Grey/Brown Agoutis.

7

8    E.    <u>PLAINTIFFS' STATE LAW CLAIMS COLLAPSE FOR THE</u>

9          <u>REASONS STATED ABOVE</u>

10

11    1.    <u>No Cartwright Act Violation</u>

12    To maintain a cause of action for a combination in restraint of trade

13  under the Cartwright Act, plaintiff must plead facts establishing:

14    (A) Formation and operation of a conspiracy;

15    (B) Illegal acts done pursuant to the conspiracy; and

16    (C) Proximate damages.

17  (1 Brown, Cal. Business Litigation, *supra,* § 5.128, p. 472.2.)

18    General allegations of a conspiracy in restraint of trade, without a

19  statement of the facts constituting the conspiracy and its object and

20  accomplishment in the restraint of trade, are legal conclusions, insufficient to

21  constitute a cause of action for damages for civil conspiracy.  (*Chicago Title*

22  *Ins. Co. v. Great W. Fin. Corp.* (1968) 69 Cal.2d 305, 315.)

23  // // //

24  // // //

25  // // //

26  // // //

27  // // //

28  // // //

1    California courts analyze Cartwright Act claims similarly to the way

2    federal courts analyze Sherman Act claims – with few "per se" exceptions,[3]

3    challenged actions are evaluated under the rule of reason.  (*Exxon Corp. v.*

4    *Superior Court* (1997) 51 Cal.App.4th 1672, 1680.)

5    Plaintiffs' Cartwright Act claims fail for two of the reasons established

6    above with respect to the Sherman Act claims:

7    (1) NPGA acted reasonably and engaged in no unlawful conduct; and,

8    (2) NPGA did not conspire with anyone to commit unlawful acts, or to

9    unlawfully pursue lawful acts.

10

11    2.    NPGA did not tortiously interfere with plaintiffs prospective

12    economic advantage

13    In order to maintain a state law cause of action for interference with

14    prospective economic advantage, plaintiffs must plead, amongst other things,

15    that there was "[a]n economic relationship between the plaintiff and some

16    third party, with the probability of future economic benefit to the plaintiff…."

17    (*Youst v. Longo* (1987) 43 Cal.3d 64, 71, fn. 6.)

18

19    To recover for interference with prospective economic advantage,
the plaintiff must prove "the existence of an economic
20    relationship with some third party that contains the probability of
future economic benefit to the plaintiff."  [Citation.]  The tort
21    protects the expectation the relationship will produce the desired
22    benefit, not "'the more speculative expectation that a potentially
beneficial relationship will arise.'" [Citation.] "Only plaintiffs
23    that can demonstrate an economic relationship with a probable
future economic benefit will be able to state a cause of action for
24    this tort." [Citation.]
25

26    _____

27    [3] Exceptions include:  group boycotts, price fixing, vertical territorial
restrictions, and tying arrangements.  (1 Brown, Cal. Business Litigation,
28    *supra*, §5.133, p. 477, and cases cited there.)

- 17 -

1   (*Sole Energy Co. v. Petrominerals Corp.* (2005) 128 Cal.App.4th 212, 244,

2   citing *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134,

3   1153-1154.)

4        Here plaintiffs' averments concerning a "prospective" economic

5   advantage are limited to their allegation that they breed Grey/Brown Agoutis,

6   for which unnamed buyers would, presumably, pay a higher price if they were

7   NPGA registered.  This cannot form the basis for a claim for unlawful

8   interference.[4]

9        Thus, no actual pending economic relationship between plaintiffs and

10   any third parties that might have potentially resulted in economic gain for

11   plaintiffs has been pled – at best, only a hypothetical future relationship

12   whereby as-yet unborn goats would be sold to as-yet unidentified buyers.

13   Again, a hypothetical future relationship that might lead to prospective

14   economic advantage does not meet plaintiffs' pleading requirements.  There

15   must be an actual, current relationship with a third party.  (*Roth v. Rhodes*

16   (1994) 25 Cal.App.4th 530, 546 [Holding that interference with prospective

17   economic advantage cannot be based on speculative future business

18   relationships, but must be based on an existing and promising business

19   relationship.]  As stated in *Roth*:

20        [A]n essential element of the tort of intentional interference with
21        prospective business advantage is the existence of a business
22        relationship with which the tortfeasor interfered. Although this
         need not be a contractual relationship, ***an existing relationship is***
23        ***required***.

24   _____

25   [4] They also allege that "defendants" "cast Plaintiffs' goats in a false light with
     actual and prospective purchasers by accusing Plaintiffs' goats of being of
26   impure bloodlines and false pedigrees."  As noted above with respect to
     plaintiff's Lanham act claims, plaintiffs have not alleged NPGA made any
27   untrue statements about plaintiffs goats whatsoever.  Therefore, this allegation
28   must be directed to the "Doe" defendants.

1  (*Roth, supra,* 25 Cal.App.4th at 546, internal citations omitted, emphasis

2  added.)

3      *Roth* is particularly instructive.  In *Roth* a podiatrist was denied space in

4  defendants' medical building.  Roth felt he had been wrongfully denied space

5  based on his profession and sued for interference with prospective economic

6  advantage.  The Court held that *Roth* had no existing business or economic

7  relationship with future, speculative patients that could have been interfered

8  with.  The *Roth* court recognized:

9
       Roth's case is predicated on the claim a tenancy in Rhodes'
10     building would result in future referrals and patient contacts.
       Therefore, from the very nature of this claim it follows Roth
11     cannot have an existing relationship with these speculative 'future
       patients.'
12

13  (*Id* at p. 546.)  The same applies here.  The very nature of plaintiffs' claims

14  admits they had no existing relationship with any speculative 'future goat

15  buyers,' but merely a hope that if they were able to breed and register future

16  Grey/Brown Agoutis there would be buyers, and plaintiffs would turn a profit.

17  The interference with prospective economic advantage torts, however, do not

18  protect the speculative expectation that a potentially beneficial relationship

19  will arise at some future time.  Instead, to be actionable plaintiffs must plead,

20  amongst other things, an actual economic relationship with an actual third

21  party.  (*Sole Energy Co.*, supra, at p. 244.)

22      Plaintiffs' claims for tortuous interference with prospective economic

23  advantage must be dismissed.

24  // // //

25  // // //

26  // // //

27  // // //

28  // // //

1    **IV.    <u>CONCLUSION</u>**

2          Plaintiffs have not alleged facts which, if credited as true, state a

3    plausible claim for relief.  (*Iqbal, supra,* 556 US at p. 679.)  Accordingly, their

4    complaint must be dismissed.

5    Dated:  April 1, 2014

6                                          HATTON, PETRIE & STACKLER

7

8                          By:            /S/ Arthur R. Petrie, II

9                                    _____
                                          Arthur R. Petrie, II
10                                       Attorneys for Defendant
                                         NATIONAL PYGMY GOAT ASS'N

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 20 -

**PROOF OF SERVICE**
**USDC, SOUTHERN DISTRICT OF CALIFORNIA**

I am employed in the County of Orange, State of California.  I am over the age of 18 and not a party to the within action; my business address is 20281 Birch Street, Suite 100, Newport Beach, CA 92660

On the date indicated below, I served the foregoing document described as **NOTICE OF MOTION AND MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED (FRCP 12(b)(6))** on interested parties in this action by placing a true and correct copy thereof enclosed in a sealed envelope addressed as follows:

SEE ATTACHED SERVICE LIST

[X]     ELECTRONICALLY through the Courts CM/ECF System

[X]     (FEDERAL): I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.  I declare that the information herein is true and correct under the penalty of perjury under the laws of the United States.

Executed on April 1, 2014, at Newport Beach, California.


 /s/ Stephanie Bruce

1

SERVICE LIST

2

3

| Edward W. Burns | **_Attorneys for Plaintiffs:_** |
|---|---|
| BURNS, SCHALDENBRAND, RODIGUEZ | Debra Hosley; Amber Waves; Donna Elkins; |
| 1155 Sportfisher Drive, Suite 120 | Proverbial Pygmies; Barbara Crane; Critter |
| Oceanside, CA 92054 | Craze Ranch; Mike Heim; Citrus Lane Pygmies; |
| Tel:  760-453-2189 | Rhonda Moore; #1 Moore Kidd; Chelsea Bates; |
| Fax: 760-453-2194 | Picture Perfect Pygmies |
| ewburns@bsrlawyers.com | |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PROOF OF SERVICE